**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| CAROL JONES<br>    *Plaintiff,*<br><br>    v.<br><br>INTERNATIONAL ASSOCIATION OF<br>SHEET METAL, AIR, RAIL, AND<br>TRANSPORTATION WORKERS ET<br>AL.,<br>    *Defendants.* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    CASE NO. 24-cv-82 |

<u>**ORDER DISPOSING OF MOTIONS TO DISMISS PLAINTIFF'S COMPLAINT**</u>

Plaintiff filed her Complaint against Defendants National Railroad Passenger Corporation (d/b/a AMTRAK), the International Association of Sheet Metal, Air, Rail, and Transportation Workers (SMART), and Francis Ariola, General Chairperson for the General Committee of Adjustment 663 SMART TD ("Local 663") (collectively, "Defendants"). She alleges Defendants discriminated against her on the basis of her gender, race, and age in violation of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (Title VII), 42 U.S.C. § 1981, the Age Discrimination in Employment Act of 1967, 29 U.S.C.S. § 621 *et seq.*, and the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. § 46a-51 *et seq.* (CFEPA). She also alleges intentional infliction of emotional distress against all Defendants.

Individually the defendants moved to dismiss Plaintiff's Complaint. *See* ECF Nos. 26-28. For the reasons articulated herein, the motions are **GRANTED in part** and are **DENIED in part.**

1

## I.    FACTS ALLEGED IN PLAINTIFF'S COMPLAINT

In 1997, Amtrak hired Plaintiff as a train conductor based in New Haven, Connecticut. ECF No. 1, ¶ 8.  She joined SMART and served as the Vice Local Chairman for her local, SMART TD Local 1361.  *Id.*, ¶ 10.  Eventually, her Locals' members elected Plaintiff "Chairman."  *Id.*  She was the first African American and woman to hold that position in the entire country.  *Id.*  To date, she is the only female and only African American Chairman throughout the country.[1]  *Id.*, ¶ 11.  She also holds the position of General Secretary with the General Committee of Adjustment 663 (GCA 663).[2]  *Id.*, ¶ 12.  Suffice to say, Plaintiff is heavily involved with the administration and activities of SMART at the local and GCA level.

In 2015, SMART members elected Plaintiff's coworker, Defendant Ariola, as the General Chairman for SMART TD GCA 663.  *Id.*, ¶ 13.  Shortly thereafter, Plaintiff alleges that Ariola subjected her to discriminatory treatment by taking away many of her roles and duties and reallocating them to Caucasian males.  *Id.*, ¶¶ 14-15.  Ariola also made her job more difficult by denying access to the office, files, the computer, and critical information relevant to her job as GCA Secretary and Local 1361 Chairman.  *Id.* ¶ 16.

Plaintiff also alleges that Ariola stifled her attempts at advancement within the union by denying her applications to other committees and appointing less experienced, Caucasian employees to the same.  *Id.*, ¶¶ 17-25.  One particular example was the "Runs

---

[1] The court presumes there is little significance to the difference between Local 1361 and SMART TD GCA 663.

[2] As explained by SMART in its briefing, which the court utilizes only for clarity, "SMART-TD has a tripartite structure: (1) the International, which functions as the administrative head of the union; (2) general committees of adjustment [], which are semi-autonomous mid-level bodies that are responsible for negotiating and enforcing the respective CBAs under their jurisdiction; and (3) locals, where membership is held." ECF No. 27-1, pg. 6 (citing *BNSF Ry. Co. v. Int'l Ass'n of Sheet Metal, Air, Rail & Transp. Workers – Transp. Div.*, 973 F.3d 326, 332 n.3 (5th Cir. 2020)).

Committee." *Id.*, ¶ 24.  Despite possessing qualifications and experience relevant to the role, Ariola appointed a male to the position instead.  *Id.*, ¶ 25.  Around September 2022, Plaintiff confronted Ariola and inquired why he appointed a more junior male employee to the "Runs Committee."  *Id.*  In response, Ariola commented that Plaintiff had five years left until retirement whereas the appointee, a less experienced male, had 15 more years until retirement.  *Id.*, ¶ 26.  She made clear to Ariola that she felt his decisions were discriminatory.  *Id.*, ¶ 28.

She reported her concerns to the highest ranks of the union.  In July 2022, she reported "complaints of unequal treatment and discrimination to the attention of Jerry Ferguson, President and Jeff Brandow, Executive Assistant to President Ferguson of SMART TD who were also in attendance."  *Id.*, ¶ 32.  Ferguson and Brandow indicated that they would investigate, but Plaintiff never heard back from either of them.  *Id.*, ¶ 33.

Plaintiff alleges Defendant Ariola threatened and "trapped" her.[3]  *Id.*, ¶¶ 34-41.  On November 17, 2022, Ariola approached Plaintiff, and ushered her into a corner with another employee (CGA 663 Vice Local Chairperson Charles Healey) behind her.  Apparently angry, Ariola threatened Plaintiff, remarking "I am sick of you and because I can't trust you, I can't talk to you without a witness."  *Id.*, ¶ 35.  Plaintiff attempted to escape from Ariola, but he followed her screaming ""[y]ou don't walk away from me."  *Id.*, ¶ 38.  According to her Complaint, Ariola spit on her as he yelled, pointed fingers inches from her face, and backed her into a fax machine.  *Id.*  Jones contacted AMTRAK police and filed a police report.  *Id.*, ¶ 43.  AMTRAK thwarted her attempts at gathering evidence, specifically a copy of the surveillance footage.  *Id.*, ¶ 50.  She was told there was nothing

---

[3] Plaintiff alleges Ariola was clocked-in as an AMTRAK employee at the time.  *Id.*, ¶ 41.

AMTRAK could do, but later, Ariola acquired the footage and presented an edited version thereof during a union trial concerning his November 17, 2022, actions.  *Id.*, ¶¶ 51-52.

AMTRAK did not remove Ariola from the workplace.  *Id.*, ¶ 47.  Jones contends that AMTRAK's failure to remove Ariola contravened prior practice and was particularly objectionable considering AMTRAK's awareness that others filed complaints against Ariola concerning his harassing, hostile and intimidating conduct toward AMTRAK employees and union members alike.  *Id.*, ¶¶ 45-48.

On November 28, 2022, Plaintiff filed a report with AMTRAK's Equal Employment Opportunities (EEO) office.  *Id.*, ¶ 53.  The investigator assigned to the matter never interviewed or question the plaintiff during the pendency of the investigation.  Nor did anyone from the EEO office reach out to the plaintiff except to tell her that the investigation had been closed.  *Id.*, ¶¶ 53-55.

On or about January 17, 2023, Jones brought charges through her union against Ariola for the events of November 17, 2022.  *Id.*, ¶ 56.  On or about May 8, 2023, it was determined Ariola violated the SMART Constitution prohibiting bullying.  *Id.*, ¶¶ 56-57.  SMART required Ariola to pay a $10,000 fine, issue a letter of apology, and undergo retraining within 30 days.  *Id.*, ¶ 58.  Yet, "Ariola did not submit to all of the issued discipline in the allotted time periods, but to present date, remains in office."  *Id.*, ¶ 59.

## II.  <u>LEGAL STANDARD</u>

Under Federal Rule of Civil Procedure 12(b), a defendant may move to dismiss a complaint for lack of subject matter jurisdiction or for failure to state a claim upon which relief can be granted.  *See* Fed. R. Civ. P. 12(b)(1), (6).

### A. 12(b)(1)

A case is properly dismissed for lack of subject matter jurisdiction if the court lacks the power to adjudicate it.  *Sokolowski v. Metro. Transp. Auth.*, 723 F.3d 187, 190 (2d Cir. 2013) (citing *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)).  "A motion to dismiss for lack of subject matter jurisdiction may raise a facial challenge based on the pleadings, or a factual challenge based on extrinsic evidence."  *Ass'n of Commuter Rail Emps. Local No 9 v. Metro-North Commuter R.R. Co.*, 600 F. Supp. 3d 367, 374 (S.D.N.Y. 2022) (internal quotation marks and citations omitted).   A fact-based 12(b)(1) motion requires the plaintiff "to come forward with evidence of their own to controvert that presented by the defendant if the affidavits submitted on a 12(b)(1) motion . . . reveal the existence of factual problems in the assertion of jurisdiction."  *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 57 (2d Cir. 2016) (internal quotation marks and citation omitted)

"The Second Circuit has instructed courts to consider the Rule 12(b)(1) challenge first since if the Court must dismiss the complaint for lack of subject matter jurisdiction, the defendant's defenses and objections become moot and do not need to be determined." *Fife v. Fin. Indus. Regul. Auth. Inc.*, No. 20-cv-10716 (AT), 2022 U.S. Dist. LEXIS 57531, 2022 WL 912945, at *2 (S.D.N.Y. Mar. 29, 2022), *aff'd*, No. 22-750, 2022 U.S. App. LEXIS 35095, 2022 WL 17818984 (2d Cir. Dec. 20, 2022) (citing *Daly v. Citigroup Inc.*, 939 F.3d 415, 426 (2d Cir. 2019)).

### B. 12(b)(6)

To survive a motion to dismiss pursuant to 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).

"The plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  Legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not entitled to a presumption of truth.  *Id.*

In deciding a motion to dismiss, the court must accept as true all well-pleaded factual allegations of the complaint and draw all reasonable inferences in the plaintiff's favor. *Bryant v. Am. Fedn. of Musicians of the United States*, 666 Fed. Appx. 14, 16 (2d Cir. 2016).  The review is confined to the facts alleged in the operative complaint unless the court elects to convert the motion to dismiss to a motion for summary judgment, an action not taken here.  *Conn. Citizens Def. League, Inc. v. Thody*, 664 F. Supp. 3d 235, 245 (D. Conn. 2023) (citing *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007)).

III.  **DISCUSSION**

    A.  **AMTRAK'S Motion to Dismiss Pursuant to 12(b)(1)**

        i.  Counts I-IV, VII, and VIII – Title VII and Connecticut Fair Employment Practices Act ("CFEPA")

The Railway Labor Act ("RLA") provides a comprehensive scheme for dispute resolution between railroad employees and their employers.  *See* 45 U.S.C. § 151 *et seq.*  The purpose of the RLA is to "promote stability in labor-management relations by providing a comprehensive framework for resolving labor disputes." *Hawaiian Airlines,*

*Inc. v. Norris*, 512 U.S. 246, 252 (1994). The courts' role in "enforcing substantive obligations under the RLA is circumscribed by its unique history and dispute-resolution framework," and the statute establishes "a unique blend of moral and legal duties looking toward settlement through conciliation, mediation, voluntary arbitration, presidential intervention, and, finally, in case of ultimate failure of the statutory machinery, resort to traditional self-help measures." *Air Line Pilots Ass'n, Int'l v. Tex. Int'l Airlines, Inc.*, 656 F.2d 16, 19-20 (2d Cir. 1981) (internal quotation marks omitted).

The RLA describes two classes of labor disputes and sets forth different procedures for their resolution: major and minor. *See Consol. Rail Corp. v. Ry. Lab. Execs.' Ass'n*, 491 U.S. 299, 302-03 (1989). "In cases where a carrier contends that a given controversy is a minor dispute, courts have typically looked to the pertinent collective bargaining agreements to determine whether a plausible interpretation would justify the carrier's action." *CSX Transp., Inc. v. United Transp. Union*, 879 F.2d 990, 997 (2d Cir. 1989) (internal quotations omitted). The Supreme Court of the United States has held "collective-bargaining agreements may include implied, as well as express, terms," and "it is well established that the parties' 'practice, usage and custom' is of significance in interpreting their agreement." *Conrail*, 491 U.S. at 311 (quoting *Transportation-Communication Employees Union v. Union P. R. Co.*, 385 U.S. 157, 161 (1966)).

The Act imposes a "relatively light burden" on a railroad to "establish[] exclusive arbitral jurisdiction under the RLA." *Conrail*, 491 U.S. 300. So long as the "employer asserts a contractual right to take the contested action, the ensuing dispute is minor if the action is arguably justified by the terms of the parties' collective-bargaining agreement." *Id.* at 307.

7

"If a dispute is characterized as minor, a court cannot assert jurisdiction over the action nor can the parties seek judicial remedies such as an injunction." *Brotherhood of Locomotive Eng'rs Div. 269 v. Long Island R.R.*, 85 F.3d 35, 37 (1996) (citing *Brotherhood of Locomotive Eng'rs v. Louisville & Nashville R.R. Co.*, 373 U.S. 33, 38 (1963) (stating that statute provides a "mandatory, exclusive, and comprehensive system" for resolving minor disputes which cannot be defeated by resort to another forum)).

Plaintiff alleges that Ariola appointed two less senior Caucasian employees to positions on the Runs and Safety committees. *See* ECF No. 1 ¶¶ 20, 22-23. Plainly, any allegation that Plaintiff was passed over for a committee role would require this court to interpret the CBA. *See Int'l Bhd. of Teamsters v. UPS Co.*, 447 F.3d 491, 500 (6th Cir. 2006) ("Because the safety committees owe their creation to the collective bargaining agreement and cannot exist independently of it, the staffing of the committees 'may be conclusively resolved by interpreting the existing [collective bargaining agreement]'") (quoting *Conrail*, at 305). Plaintiff's allegations also would likely require the court to review established past practices. *See, e.g.,* ECF No. 1 ¶ 109; ECF No. 26-1, Dellapietro Aff. ¶¶ 3-7, Graham Aff. ¶¶ 5-8 (averring the Runs and Alternate Vacation Coordinator committees "operated following the same practices and procedures as the committees specifically addressed by the CBA, including with respect to the Union's having exclusive authority to appoint members to those committees").

For her part, Plaintiff does not meaningfully dispute AMTRAK's arguments. Instead, she relies on circular and conclusory statements, specifically that "Plaintiff's claims do not arise from the interpretation or application of the CBA's provisions regarding committee appointments. Rather, they arise from Amtrak's discriminatory practices and

failure to address harassment, which are independent of the CBA's terms." ECF No. 31, pg. 5. But the discriminatory practices Plaintiff alleges flow from entities created by the CBA or, at least with respect to the Runs and Alternate Vacation Coordinator committees, from entities that "operated following the same practices and procedures as the committees specifically addressed by the CBA." Further, while the plaintiff incorporated the allegations of her Complaint into Counts I-IV, the focus of those Counts is on Ariola's reluctance to appoint her to committee positions.

The Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act ("EFAA"), which amended the Federal Arbitration Act, 9 U.S.C. §§ 1 et seq. ("FAA"), does not alter the court's conclusion. The FAA preempts conflicting state law, that is state law which invalidates arbitration agreements. *Allied-Bruce Terminix Cos., Inc. v. Dobson*, 513 U.S. 265, 272 (1995). Section 1 of the FAA limits the reach of the FAA. Section 1 provides that "nothing herein contained shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1. Thus, the FAA, and consequently the EFAA, exempt railroad workers from its scope.[4]

Therefore, the court dismisses without leave to amend Counts I-IV, VII, and VIII, pursuant to Rule 12(b)(1), insofar as Plaintiff relies on her allegations concerning committee appointments.

---

[4] Plaintiff did not argue Connecticut state law would change the court's ultimate conclusion; therefore, the court does not consider it.

### B. __AMTRAK'S 12(b)(6) Motion__

i.  __Count V – Title VII Hostile Work Environment__

To overcome a motion to dismiss for failure to state a claim as to her hostile work environment allegation, Plaintiff must plead facts alleging that the challenged conduct: (1) "is objectively severe or pervasive—that is, . . . creates an environment that a reasonable person would find hostile or abusive;" (2) "creates an environment that the plaintiff subjectively perceives as hostile or abusive;" and (3) "creates such an environment because of the plaintiff's [status in a protected class]." *Patane v. Cla*rk, 508 F.3d 106, 113 (2d Cir. 2007) (internal quotation marks omitted) (citing *Gregory v. Daly*, 243 F.3d 687, 691–92 (2d Cir. 2001)).

Title VII "does not set forth a general civility code for the American workplace." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68  (2006) (cleaned up).  Plaintiff must demonstrate "either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of [his] working environment." *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (cleaned up).  "Isolated acts, unless very serious, do not meet the threshold of severity or pervasiveness." *Id.*  However, the United States Court of Appeals for the Second Circuit repeatedly has cautioned against setting the bar too high at the motion to dismiss stage.  *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003).

The crux of Plaintiff's hostile work environment claim is the incident she alleges took place on or around November 17, 2022.  According to her Complaint, "Ariola asked to speak with Plaintiff . . . and cornered [her] between himself and another male."  ECF No. 1 ¶ 88.  Plaintiff managed to escape but Ariola pursued while yelling and screaming

at Plaintiff.  *Id.* ¶ 89.  He then approached the plaintiff "in a fit of rage, pointing his finger inches from Plaintiff's face, spitting on her as he yelled, backing Plaintiff up against the fax machine."  *Id.*

Such a confrontation clearly supports a hostile work environment claim, but the question is whether it represents the sort of "extraordinarily severe" incident which withstands a motion to dismiss.  *Banks v. GM, LLC*, 81 F.4th 242, 263 (2d Cir. 2023)  ("A single incident must be extraordinarily severe to support a hostile work environment claim, but it need not involve an actual or threatened physical assault.") (cleaned up); *see also Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) ("isolated incidents (unless extremely serious) will not amount to" a hostile work environment).  Although Plaintiff's allegations are without question inappropriate and offensive, they do not rise to the level of being "extraordinarily severe."  *Russo v. New York Presbyterian Hosp.*, 972 F. Supp. 2d 429, 445 (E.D.N.Y. 2013) (holding that trapping plaintiff and yelling at her did not constitute hostile work environment); *Faison v. Leonard St., LLC,* No. 08–cv–2192, 2009 WL 636724, at *4 (S.D.N.Y. Mar. 9, 2009) (dismissing a hostile work environment claim because "allegations of persistent shouting and a display of poor temperament are insufficient to state a plausible hostile-environment claim"); *see also Mathirampuzha v. Potter*, 548 F.3d 70, 73 (2d Cir. 2008) (holding that spitting in one's face is insufficient to maintain a hostile workplace claim);  *Blue v. City of Hartford*, No. 3:18-cv-974 (CSH), 2019 WL 7882565, at *6, 2019 U.S. Dist. LEXIS 227033, *15-17 (D. Conn. Oct. 22, 2019). With this line of cases still good law, the court cannot find the present facts to so qualify.

Accordingly, AMTRAK's motion to dismiss Plaintiff's hostile work environment claim is granted.  However, the plaintiff's briefing appears to indicate that there might be

other incidents which ought to have been included in her complaint. Normally, it would be strange to dismiss race and gender discrimination claims yet permit a hostile workplace claim to proceed; however, there might be circumstances where it is permissible, such as where the claims concern different employer conduct.[5] Out of an abundance of caution, the court grants Plaintiff leave to amend her hostile workplace claim to the extent she also asserts it upon claims related to her work responsibilities.

### ii. Count VI – Title VII Disparate Treatment

The court reads Count VI more broadly than Defendant AMTRAK. While it certainly repeats Plaintiff's committee allegations, it also alleges that AMTRAK failed to perform a bona fide investigation of her complaints and subjected her to other forms of disparate treatment.

As a preliminary matter, the court rejects AMTRAK's contention that Plaintiff did not suffer an adverse employment action.[6] Plaintiff alleged AMTRAK, *inter alia*, denied her job advancement opportunities. ECF No. 1 ¶ 98. She also alleged that AMTRAK did not take her complaints seriously, performed an inadequate investigation of her claims, and sought to "cover-up" evidence that would establish EEO violations. *Id.* ¶¶ 46-55.

The plaintiff does not have to show that the harm incurred was significant or that it otherwise exceeded some heightened bar. *Muldrow v. City of St. Louis*, 601 U.S. 346, 350 (2024). Instead, she need only allege "*some* harm respecting an identifiable term or

---

[5] Here, Counts I-IV, VII and VIII concern appointment to union positions whereas Count V focuses on a single incident involving Defendant Ariola.

[6] In cases alleging discrimination in the employment context, a plaintiff need not provide "substantial evidence of discriminatory intent" at the initial stage of the litigation but still has the "minimal burden of showing facts suggesting an inference of discriminatory motivation" to satisfy her prima facie requirements. *Littlejohn v. City of New York*, 795 F.3d 297, 311 (2d Cir. 2015). Defendant does not argue that Plaintiff failed to otherwise establish a *prima facie* case, so the court does not consider whether Plaintiff satisfied the "minimal burden" of showing an inference of discriminatory motivation.

condition of employment," but such harm need not be "significant . . . [o]r serious, or substantial, or any similar adjective suggesting that the disadvantage to the employee must exceed a heightened bar." *Id.* at 347; *see id.* at 980 (providing illustrative examples of what constitutes "some harm," including a loss in "money, time, satisfaction, schedule, convenience, commuting costs or time, prestige, status, career prospects, interest level, perks, professional relationships, networking opportunities, effects on family obligations, or the like") (Kavanaugh, J., concurring).

The court cannot dismiss Count VI at this juncture on the grounds presently argued by the defendant.  Plaintiff appears to argue she was entitled to an earnest investigation by AMTRAK.  AMTRAK does not argue Plaintiff's complaints were unreasonable.  Thus, by allegedly depriving Plaintiff of a reasonable workplace investigation, she was denied a term and condition of her employment.  Whether Plaintiff can adduce admissible evidence sufficient to withstand a summary judgment motion remains to be seen. Defendant AMTRAK's Rule 12 motions are denied with respect to Count VI.[7]

     iii.   <u>Count IX – 42 U.S.C. § 1981 Race Discrimination</u>

For the reasons articulated with respect to Counts V and VI, AMTRAK's motion to dismiss is denied.

     iv.   <u>Count X – Intentional Infliction of Emotional Distress</u>

Consistent with the court's dismissal of the hostile work environment claim, Plaintiff's intentional infliction of emotional distress claim is dismissed because the alleged

---

[7] To be clear, Plaintiff will not be permitted to shoehorn allegations surrounding committee assignments into Count VI.  Those claims have been dismissed pursuant to Rule 12(b)(1).  So, discovery seeking information about who knew what and when regarding committee assignments would be irrelevant to Plaintiff's claims surrounding AMTRAK's denial of advancement opportunities and its substandard investigation.  Plaintiff is warned not to use Count VI as a fishing expedition to resurrect dismissed claims. Further, the court rejects the claim that Plaintiff did not exhaust her administrative remedies as to Count VI.

conduct was not extreme and outrageous under the current state of the law.  While certainly offensive, conduct must be more than offensive to support a claim for intentional infliction of emotional distress.  *Perez-Dickson v. City of Bridgeport*, 304 Conn. 483, 527, 43 A.3d 69, 101 (2012) (citation omitted).  Count X is dismissed with leave to amend.

### C.  **SMART'S Motion to Dismiss Pursuant to 12(b)(6)**

It is unlawful for a labor organization to exclude or to expel from its membership, or otherwise to discriminate against, any individual because of her race, color, religion, sex, or national origin.  42 U.S.C. § 2000e-2(c).  Similarly, it is unlawful for a labor organization to exclude, expel, or otherwise discriminate against any individual because of her age.  29 U.S.C. § 623(c).   Here, Plaintiff chose not to sue her Local; rather, she alleges the International discriminated against her based on her membership in a protected class.

#### i.   Counts I, III, and VII (Title VII and ADEA Claims)

##### 1.  *Carbon Fuel* and Title VII

Whether an international union may be held vicariously liable for the acts of a Local is a question of agency between the same.  *Carbon Fuel Co. v. United Mine Workers*, 444 U.S. 212, 217 (1979) (citing *Coronado Coal Co.* v. *Mine Workers*, 268 U.S. 295, 304 (1925)).  Though separated by a half-century, both *Coronado Coal* and *Carbon Fuel* involved "wildcat strikes" at coal mines in western Arkansas and West Virginia respectively.   The latter considered whether "an international union, which neither instigates, supports, ratifies, nor encourages wildcat strikes engaged in by local unions in violation of a collective-bargaining agreement, may be held liable in damages to an affected employer if the union did not use all reasonable means available to it to prevent

the strikes or bring about their termination." *Carbon Fuel*, 444 U.S. 213.  That narrow

issue notwithstanding, courts in this circuit have read *Carbon Fuel* more broadly to hold

that an "international union has no independent duty to intervene in the affairs of its local

chapters," even where the international has knowledge that the local's unlawful acts may

violate Title VII. *See, e.g., Campbell v. International Bhd. of Teamsters*, 69 F. Supp. 2d

380, 386 (E.D.N.Y. 1999).

During a wildcat strike, "recalcitrance sometimes is directed at the incumbent union

leadership as much as at company management" and "the union's attempt to discipline

is unlikely to be effective and may be counterproductive." *Complete Auto Transit v. Reis*,

451 U.S. 401, 422 (1981).  Imposing liability on an international under such circumstances

would be ineffective at deterring the unlawful conduct in that case and in future cases.

The threat of liability would force unions to discipline members whose martyrdom might

well inflame a strike that is already, by its nature, out-of-control.  That is to say, there are

valid practical reasons to insulate international unions from their failure to intervene during

wildcat strikes.

The same cannot be said when a somewhat senior union official discriminates

against members based on protected characteristics.   "Title VII's central statutory

purposes of eradicating discrimination throughout the economy and making persons

whole for injuries suffered through past discrimination." *Landgraf v. Usi Film Prods.*, 511

U.S. 244, 254-255 (1998).  Insulating the union serves no equal purpose; rather, it

contravenes the statute's fundamental purpose to eradicate discrimination based on race,

gender or, through the ADEA, age.

15

Paradoxically, the cases that rely on *Carbon Fuel* for the proposition that unions have no independent duty to intervene in the affairs of its local chapters (even where the international has knowledge of the local's unlawful acts) undermine the agency analysis *Carbon Fuel* demands. The Supreme Court of the United States instructed lower courts to apply agency principles, specifically ratification. *Carbon Fuel*, 444 U.S. 218 (requiring evidence that the "International Union instigated, supported, ratified, or encouraged any of the [unlawful activity]"). In many states, acquiescence through silence constitutes ratification. *Cmty. Collaborative of Bridgeport, Inc. v. Ganim*, 241 Conn. 546, 561-62, 698 A.2d 245 (1997) ("Silence…may imply an intent to ratify"). SMART would have this court overlook that part of the agency analysis and apply a blanket rule (borrowed from LMRDA and LMRA cases). *See* ECF No. 27-1, pg. 14, 15 (citing *Phelan v. Local 305 of United Ass'n of Journeymen*, etc., 973 F.2d 1050, 1061-62 (2d Cir. 1992) ("An international union has no independent duty to intervene in the affairs of its local chapters, even where the international has knowledge of the local's unlawful acts.")) (citing *Carbon Fuel*, 444 U.S. 217-218).[8] Adopting that proposition effectively would exclude ratification by silence from the well-established framework of agency law thereby undermining the Supreme Court's instructions in *Carbon* Fuel and eroding the congressional intent behind Title VII to eliminate discrimination in all its forms. Additionally, it would extend *Phelan*, a case decided at summary judgment, to motions made pursuant to Rule 12 – a posture in which courts do not have the benefit of discovery to discern the intent behind the International's silence. Instead, the court declines to apply this blanket rule, especially when presented

---

[8] Critically, *Phelan* was not a Title VII case. Instead, Plaintiffs brought suit pursuant to the Labor Management Reporting and Disclosure Act (LMRDA), 29 U.S.C. § 411 *et seq.*, and § 301 of the Labor Management Relations Act (LMRA), 29 U.S.C. § 185 after a Business Manager (and his brother) sought "revenge" against his opponents through his ability to control hiring hall referrals.

through a motion to dismiss pursuant to Rule 12.  *See Botticello v. Stefanovicz*, 177 Conn. 22, 26 (1979) ("The existence of an agency relationship is a question of fact.").

> 2.  *Ratification*

Ratification may be express or implied.  12 *Williston on Contracts*, § 35:22 (4th ed.).  The first step to pleading ratification is demonstrating Defendant's full knowledge of all the material facts.  *Russell v. Dean Witter Reynolds, Inc.*, 200 Conn. 172, 185 (1986).  Next, "[r]atification requires acceptance of the results of the act with an intent to ratify." *Parnoff v. Yuille*, 139 Conn. App. 147, 165 (2012); *see also Chevron Corp. v. Donziger*, 833 F.3d 74, 150 (2d Cir. 2016) (quoting Restatement (Third) of Agency § 4.01(2)).  That requires showing the International accepted the results of the act with an intent to ratify and with full knowledge of the material circumstances.  *Cmty. Collaborative of Bridgeport, Inc. v. Ganim*, 241 Conn. 546, 560-61, 698 A.2d 245 (1997) (quotation marks and citation omitted).  "Silence, as well as affirmative acts, may imply an intent to ratify." *Id.* at 561-62 (quotation marks and citation omitted); *see Ackerman v. Sobol Family Partnership, LLP*, 298 Conn. 495, 511–12, 4 A.3d 288, 300 (2010) ("Silence may constitute a manifestation when…a reasonable person would express dissent to the inference that other persons will draw from silence"), *Cohen v. Holloways', Inc.*, 158 Conn. 395, 408, 260 A.2d 573 (1969) ("ratification of the unauthorized act is presumed from failure to disaffirm"); *see also Williston on Contracts*, § 35:24 Conduct constituting ratification— Silence, 12 (4th ed.).

Plaintiff properly alleged facts tending to show the International was aware of discriminatory behavior.  First, the International attempted to mediate the dispute between Jones and Ariola.  ECF No. 1, ¶ 29.  Second, Jones reported her concerns directly to

17

Jerry Ferugson, President of the International and his Executive Assistant, Jeff Brandow. *Id.*, ¶¶ 32-33.  While her Complaint is hardly a fulsome account of the conversation, on a motion to dismiss, the court is required to draw all reasonable inferences in favor of the plaintiff.  *Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 566 (2d Cir. 2016).  Together, these facts tend to show the International was aware of the plaintiff's complaints.

As previously stated, knowledge is not enough.  Faced with an international's inaction, the court is left to wonder whether this suggests a conscious choice to avoid the affairs of its locals, or ratification of the conduct through silence.  It is important not to conflate silence with powerlessness.  Plaintiff does not point to any part of the International's Constitution that would empower it to compel Ariola to mediation.[9]  Without that allegation, it is hard to place any weight on the International's silence.[10] That said, it is plausible that Ferguson's and Brandow's silence exhibited an intent to ratify Ariola's conduct.  Cases cited by SMART on this point are unavailing.  Perhaps tellingly, *Phelan* was decided on a motion for summary judgment.  The court is reluctant to do here what others have done at later stages in litigation, but it is also reluctant to permit the case to proceed without any allegation supporting an inference of discrimination, such as that SMART had the power to act, but failed to do so.

Therefore, SMART's motion to dismiss Counts I, III, and VII is granted with leave to amend.

---

[9] Plaintiff conclusory allegation that the Defendant had the "power to prevent or aid in preventing" in Count IX cannot be imputed to the rest of her Complaint.  ECF No. 1, ¶ 120.

[10] In fact, if attempting to mediate the dispute (as opposed to compelling attendance) was the extent of the International's legitimate authority, it can be said that the International did all it reasonably could to put a stop to Ariola's conduct.

ii.    Counts II, IV, and VIII (State Law Discrimination Claims)

SMART moves to dismiss Plaintiff's state law discrimination claims. The motion is granted. Under the CFEPA, the plaintiff must allege a *prima facie* case, including that the adverse employment action occurred under circumstances giving a rise to an inference of discrimination. *Feliciano v. AutoZone, Inc.*, 316 Conn. 65, 79-80 (2015). Such allegations may not be the result of "mere conjecture" or "surmise." *Bd. of Educ. of Norwalk v. Comm'n on Human Rights & Opportunities*, 266 Conn. 492, 517 (2003). Further, Connecticut have applied the CFEPA with an eye toward federal law. *Brittell v. Dept. of Correction*, 247 Conn. 148, 164, 717 A.2d 1254 (1998) ("[i]n defining the contours of an employer's duties under our state antidiscrimination statutes, we have looked for guidance to federal case law interpreting Title VII . . . the federal statutory counterpart to § 46a-60"). Therefore, the court applies its Title VII analysis and finds the plaintiff has failed to allege facts supporting an inference of discrimination.[11] Defendant SMART's motion to dismiss Counts II, IV, and VIII is granted with leave to amend.

iii.    Counts V and X (Hostile Workplace and IIED Claim)

SMART's motion to dismiss Plaintiff's hostile work environment and IIED claims is granted without prejudice and Plaintiff is granted leave to amend. As articulated above, the conduct illustrated in Plaintiff's complaint does not rise to the level of a hostile work environment nor that of the outrageousness needed to sustain an IIED claim.

iv.    Counts VI and IX (Federal Disparate Treatment Claim)

Disparate Treatment is "the most obvious evil" that Congress had in mind when it enacted Title VII but it also is "the most easily understood." *Ricci v. DeStefano*, 557 U.S.

---

[11] The court assumes, without deciding, that the plaintiff can otherwise establish a *prima facie* case.

557, 577 (2009) (internal citations omitted); *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977).

Plaintiff's first objective is to state a *prima facie* case of discrimination, which requires Ms. Jones to show that (1) she belonged to a protected class; (2) she was qualified for the position he held; (3) she suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent. *Holcomb v. Iona College*, 521 F.3d 130, 138 (2d Cir. 2008).

As articulated above with respect to Plaintiff's Title VII and CFEPA claims, the court does not find Plaintiff plausibly demonstrated discriminatory intent. In fact, the court is not convinced Plaintiff identified an actionable adverse employment action. Therefore, SMART's motion to dismiss is granted with respect to Plaintiff's disparate treatment claim. For the same reasons, the court grants SMART's motion to dismiss Count IX, Plaintiff's § 1981 claims. *See Hill v. Rayboy-Brauestein*, 467 F. Supp. 2d 336, 368 (S.D.N.Y. 2006). The court grants Plaintiff leave to amend Counts VI and IX.

### D.  Ariola's Motion to Dismiss Pursuant to 12(b)(6)

As a preliminary matter, Title VII and the ADEA preclude individual liability. *Cherry v. Toussaint*, 50 Fed. Appx. 476, 477 (2d Cir. 2002) (affirming dismissal of ADEA claims), *Wrighten v. Glowski*, 232 F.3d 119, 120 (2d Cir. 2000) (affirming dismissal of Title VII claims). Therefore, Counts I, III, V, VI, and VII as alleged against Defendant Ariola are dismissed with prejudice.

Additionally, the court is persuaded that Plaintiff did not properly allege her claims under state law as argued by Defendant Ariola. Therefore, Counts II, IV, and VIII are dismissed with leave to amend.

20

Defendant Ariola's motion to dismiss Count IX claim is granted consistent with the court's prior articulation.  The plaintiff is granted leave to amend.  In that vein, Count X also is dismissed with leave to amend.

IV.    **CONCLUSION**

Accordingly, it is thereupon **ORDERED AND ADJUDGED** as follows:

1. AMTRAK's motions to dismiss are granted in part and denied in part.

   a. AMTRAK's motion to dismiss pursuant to Rule 12(b)(1) is granted as to Counts I-IV, VII, and VIII as they relate to Plaintiff's allegations concerning committee appointments without leave to amend, but is denied in all other respects.

   b. AMTRAK's motion to dismiss pursuant to Rule 12(b)(6) is granted as to Counts V, IX, and X with leave to amend, but it is denied as to Count VI.

2. SMART's motion to dismiss is granted.  The plaintiff is granted leave to amend on all counts.

3. Defendant Ariola's motion to dismiss is granted.  The plaintiff is granted leave only with respect to counts II, IV, XIII, IX, and X.

**IT IS SO ORDERED** in Hartford, Connecticut, this 25th day of July, 2025.

_____/s/_____
OMAR A. WILLIAMS
UNITED STATES DISTRICT JUDGE